**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **LORNA W.,** | |
| Plaintiff, | |
| v. | Civil Action No. 21-4937 (ZNQ) |
| **COMMISSIONER OF SOCIAL SECURITY,** | **OPINION** |
| Defendant. | |

**QURAISHI, District Judge:**

Lorna W. ("Plaintiff") appeals from the final decision of the Commissioner of Social Security ("Defendant"), denying Plaintiff's application for disability under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record (A.R.), the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence, and accordingly, the ALJ's decision is **AFFIRMED**.

## I.      FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born on December 23, 1955 and was 57 years old on May 9, 2013—the alleged onset date of her disability. (A.R. 166-67.) Plaintiff has a high school education and has worked as a customer service representative. (A.R. 33.) On March 30, 2015, Plaintiff filed a Title II application for a disability and disability insurance benefits due to stress, cervical surgery, and two knee meniscus surgeries. (A.R. 72, 166-67.)

Plaintiff's application was denied initially on July 21, 2015, and again upon reconsideration on December 11, 2015. (A.R. 15, 86.) Plaintiff then filed a written request for a hearing before an

administrative law judge, which was held on October 11, 2017, before ALJ Peter R. Lee. (A.R. 29-57.) On December 11, 2017, the ALJ determined Plaintiff was not disabled pursuant to the Social Security Act from May 9, 2013, through December 11, 2017. (A.R. 14-22.) Plaintiff requested review of the ALJ's decision by the Appeals Council, which was denied on August 16, 2018. (A.R. 1.) Plaintiff appealed to the District Court on September 28, 2018. On July 23, 2019, the Honorable Chief Judge Freda L. Wolfson, U.S.D.J. (ret.) remanded the case to Defendant for further administrative hearing. (A.R. 1456.) On August 17, 2019, the Appeals Council issued an order remanding the case to the ALJ and directed the ALJ to give further consideration to the medical opinions of the listed medical and non-medical source opinions. (A.R. 1456-58.) Upon remand, the ALJ held another hearing on January 29, 2020. (A.R. 1423-47.) On November 13, 2020, the ALJ again determined Plaintiff was not disabled pursuant to the Social Security Act from May 9, 2013, through December 31, 2018—the last date insured. (A.R. 1373-96.) Thereafter, Plaintiff filed the instant appeal on March 12, 2021. (ECF No. 1.)

### A.  Review of Medical Evidence

#### i.  Medical Records

##### 1. Dr. Armin Tehrany, M.D. (2013-2016)

From 2013 to 2016, Plaintiff received treatment from Dr. Armin Tehrany, M.D., an orthopedic surgeon, for injuries to and pain in her knees.

Plaintiff injured her left knee after she slipped and fell at work on May 9, 2013. (A.R. 347, 456, 1378.) On May 20, 2013, Plaintiff was examined by Dr. Tehrany, where she reported immense pain, limited range of motion, extreme medial joint line tenderness, mechanical symptoms, and +1 effusion. (A.R. 318.) In subsequent visits to Dr. Tehrany, MRIs of Plaintiff's left knee showed a tear of the left medial meniscus and right knee internal derangement. (A.R.

351, 352.) Plaintiff had also received physical therapy and cortisone injections, however Plaintiff told Dr. Tehrany that the pain was getting much worse and that she could barely walk. (A.R. 350, 351.)

Due to Plaintiff's traumatic tear of the left medial meniscus with chondral defect, on August 13, 2013, Dr. Tehrany performed a left medial meniscectomy, a synovectomy of the left knee, and chondroplasty. (A.R. 336, 748.) She participated in physical therapy thereafter. On January 7, 2014, a follow-up appointment with Dr. Tehrany showed that Plaintiff was recovering very slowly since the left knee surgery, but she was making improvement; she regained near full range of motion, was diffusely tender, had no effusion, and was making progress overall. He also noted left shoulder pain. (A.R. 305.)

On August 12, 2014, Plaintiff underwent knee surgery by Dr. Tehrany for right medial and lateral menisectomy, multicompartment synovectomy, and chondroplasty. (A.R. 617-19.) On May 5, 2015, Plaintiff had a follow-up visit with Dr. Tehrany where she continued to have pain with arthritis following bilateral knee arthroscopies in 2013 and 2014. (A.R. 987.) Dr. Tehrany administered bilateral cortisone shots into Plaintiff's knees. (*Id.*)

On May 5, 2015 and June 30, 2015, Dr. Tehrany submitted his medical opinion on Plaintiff's behalf to the Social Security Disability Administrating, stating that Plaintiff's ability to do work-related activities was limited as follows: limited in pushing and pulling, could lift and carry no greater than five to ten pounds, stand/walk for less than two hours per day, and sit for less than six hours per day. (A.R. 991, 998.)

An x-ray of the knees ordered by Dr. Tehrany on January 4, 2014 displayed severe osteoarthritis in the left knee joint and moderate to severe osteoarthritis in the right knee joint. (A.R. 1128.)

## 2.  Dr. John Shiau, M.D. (2013-2015) (neck, back)

Between July 2013 and July 2015, Plaintiff was treated by Dr. John Shiau, M.D., a neurosurgeon, for neck and back pain. (A.R. 704-746.)

Over the course of several neurological evaluations by Dr. Shiau in 2013, Plaintiff was diagnosed with cervical spondylosis and traumatic induced neck pain. (A.R. 721-22, 741.) Diagnostic imaging on January 31, 2014 revealed degenerative disc disease and grade 1 spondylosis especially at the C4-5 and C5-6 levels of the spine. (A.R. 459.)

On March 27, 2014, Plaintiff underwent cervical spine surgery performed by Dr. Shiau. (A.R. 429.)[1] On June 25, 2014, an MRI of the cervical spine ordered by Dr. Shiau showed post-operative changes following the spine surgery. (A.R. 817.) On September 18, 2014, a CT scan of the cervical spine showed significant multilevel neural foraminal narrowing, moderate to severe at from C3 to T1, but the degenerative changes seen were stable. (A.R. 812.) On October 14, 2014, a nerve conduction study showed neuropathic dysfunction in the C7-8 nerve root distribution and that her EMG was normal. (A.R. 731.) In a letter dated November 21, 2014, Dr. Shiau opined that Plaintiff was diagnosed with right-sided diaphragmatic paralysis, likely as a complication of her spine surgery in March 2014. (A.R. 754.) An MRI on March 30, 2015 showed L3-L4 and L4-L5 disc bulges and L5-S1 disc herniation indenting the anterior epidural space. (A.R. 809.) On April 10, 2015, an x-ray of the cervical spine conducted by Dr. Shiau showed no acute osseous pathology, no suspicion of osteomyelitis, and no cervical instability was seen. (A.R. 805.)

Plaintiff continued to receive treatment from Dr. Shiau for her cervical and lumbar pain though July 20, 2015. (A.R. 1014-15.) Over the course of several neurological follow-up visits,

---

[1] Specifically, Dr. Shiau performed performed an anterior cervical C5 corpectomy with C4-C5 and C5-C6 discectomy and arthrodesis, interbody cage fusion at C4-C6, anterior cervical plating and stabilization at C4-C6, and microscopic dissection and decompression of the spinal cord and nerve roots. (A.R. 429.)

Dr. Shiau repeatedly diagnosed Plaintiff with cervical pain, cervicalgia, lumbago, and lumbar pain. (*See, e.g.*, A.R. 729, 731-32, 1014-15.) He also repeatedly found that Plaintiff had a limited range of motion of the cervical and lumbar spine with posterior midline neck tenderness and midline lumbar and paraspinal musculature tenderness. (*See, e.g.*, A.R. 728, 731, 1014.) Dr. Shiau also observed Plaintiff had 5/5 strength in all extremities with no sensory abnormalities and walked independently with a slightly antalgic gait. (*See, e.g.*, *id.*) During these visits, Plaintiff also repeatedly reported 10/10 neck and lower back pain. (*See, e.g.*, A.R. 731, 1014.) After each visit, Dr. Shiau opined that Plaintiff "remains totally disabled and is unable to return to work secondary to her cervical and lumbar injuries." (A.R. 729, 732.) Further, Dr. Shiau advised Plaintiff "to refrain from lifting heavy objects, bending excessively, pulling or twisting" and opined that she was "unable to stand or sit for prolonged periods of time" due to her conditions. (A.R. 732, 1015.) In a letter dated August 2015, Dr. Shiau opined that Plaintiff suffered chronic cervical and lumbar pain and may need additional cervical surgery in the future. (A.R. 1080.)

### 3.  Manhattan Spine & Pain Medicine, P.C. (2014-2015) (neck, back)

Plaintiff received treatment from Manhattan Spine & Pain Medicine, P.C. in 2014 and 2015 related to her constant lower back pain and numbness in her bilateral lower extremities. (A.R. 481-95.)

On January 16, 2014, Plaintiff underwent a cervical epidural steroid administration at C7-T1 andam epidurogram performed by Dr. Sanjay Bakshi, M.D.—a pain management physician—to treat her diagnosis of cervical disc herniation and cervical radiculopathy. (A.R. 492.) On October 9, 2014 and December 11, 2014, Plaintiff was injected with facet nerve blocks in her lumbar spine by Dr. Bakshi (A.R. 654-55, 679-80.)

On May 7, 2015, during a follow up visit with Dr. Bakshi, Plaintiff reported she had a significant amount of neck and arm pain. (A.R. 1084.) Dr. Bakshi diagnosed the claimant with displacement of the cervical intervertebral discs, thoracic or lumbosacral neuritis, and brachial neuritis or radiculitis. (A.R. 1085.)

During another follow-up visit on October 16, 2015, Dr. Gerard DeGregoris, M.D., a pain management physician, diagnosed Plaintiff with cervical and lumbar radiculopathy and found that Plaintiff had a decreased range of motion of the cervical and lumbar spine, decreased lumbar lordosis, and diffuse tenderness of the superior trapezius of the cervical spine. (A.R. 1120-22.)

### 4. Dr. Rekha Rao, M.D. (2016)

In a neurological follow-up visit with Dr. Rekha Rao, M.D. on April 5, 2016, Dr. Rao diagnosed Plaintiff with cervical radiculitis, lumbar radiculopathy, pain in the limb, and cervical myofascial spasm with numbness in the 4th and 5th digits bilaterally. (A.R. 1189-90.) She recommended ongoing medication management and to follow up for a trigger point injection. (*Id.*)

Upon neurological examination, Dr. Rao found Plaintiff was in no acute distress, had normal cranial nerves, limited range of motion in the neck on both sides, decreased sensation to the fingers bilaterally, normal coordination, and normal gait. (A.R. 1190.) With respect to mental status, Dr. Rao noted Plaintiff's mental status was normal without evidence of disorientation or impaired concentration. (*Id.*) Further, she opined that Plaintiff's short-term recall and remote memory was intact. (*Id.*)

### 5. Dr. Adam Lipson, M.D. (2016, 2017)

In April, May, and December 2016, Plaintiff visited Dr. Adam Lipson, M.D., a neurosurgeon, for ongoing lower cervical pain that radiated into her arms and hands. (A.R. 1132-33, 1244-45, 1246-48.)

In follow-up appointments in April and May 2016, Dr. Lipson observed that Plaintiff had a limited range of motion and flexion, extension, and lateral bending with significant tenderness of the cervical spine. (A.R. 1132, 1247.) At the April 2016 appointment, Plaintiff reported progressive lower cervical spine pain and significant low back pain. (A.R. 1246.) Dr. Lipson also opined that Plaintiff had a positive straight leg test bilaterally to 60°, tenderness over the lumbar spine at the facet joints, and full strength and intact sensation. (A.R. 1247.) At the May 2016 follow-up visit, Plaintiff reported ongoing cervical pain radiating into her arms and hand bilaterally. (A.R. 1132.) Dr. Lipson also observed that Plaintiff had no residual low back pain symptoms. (*Id.*) Dr. Lipson recommended a posterior C3 to C7 decompression and fusion, but Plaintiff wanted to proceed with maximizing interventional therapy. (*Id.*)

In another follow-up appointment in December 2016, Plaintiff told Dr. Lipson that her pain was affecting her daily activities, including walking, standing, and climbing stairs. It worsened with extension and turning sude-to-side, bilaterally (A.R. 1244-45.) Upon examination by Dr. Lipson, Plaintiff exhibited decreased sensation to light touch and pinprick throughout the left arm, tenderness to palpation overlying the lower cervical spine, pain radiating to the upper extremities, and mild tenderness to palpation over the lower lumbar spine. (A.R. 1245.) Dr. Lipson again recommended a posterior C3 to C7 laminectomy and fusion but he noted that Plaintiff would continue with conservative management for her pain. (*Id.*) Dr. Lipson further opined that Plaintiff "must remain out of work about 100%." (*Id.*)

On August 28, 2017, an x-ray of the lumbar spine ordered by Dr. Lipson displayed Grade 1anterolisthesis at L4-L5 with severe disc space narrowing at L5-S1. (A.R. 1369.)

**6.  Dr. Cris Beiro, M.D.**

From 2016 through 2018, Plaintiff received treatment from Dr. Cris Beiro, MD., an orthopedic surgeon, for her bilateral knee pain. (A.R. 1226-1243, 1291-1306.)

In 2016, multiple physical exams conducted by Dr. Beiro showed Plaintiff's bilateral knees had mild soft tissue swelling, tenderness, and a reduced range of motion with mild pain. (A.R. 1235.) In May 2016, X-rays of the right and left knee ordered by Dr. Beiro also revealed severe degenerative changes. (A.R. 1237.) On July 29, 2016, Dr. Beiro performed a right knee arthroscopy, debridement of the ACL tear, partial medial meniscectomy, and lateral tibial plateau chondroplasty of the right knee. (A.R. 1226-27.) During a follow-up examination on August 8, 2016, Dr. Beiro observed that Plaintiff's pain had steadily improved following the surgery. (A.R. 1227.) Dr. Beiro further observed that Plaintiff's pain was controlled with medication, her motor and sensory abilities were intact, and that she was walking without crutches. (*Id.*) He recommended a course of physical therapy. (*Id.*) In another follow-up visit in October 2016, Dr. Beiro observed that Plaintiff's knee symptoms had worsened and there was no improvement with physical therapy. (A.R. 1291.) He administered a cortisone injection in Plaintiff's right knee. (A.R. 1291.)

In March 2017, because significant pain persisted, Plaintiff underwent a total right knee replacement surgery performed by Dr. Beiro. (A.R. 1241-1243, 1295.) In post-surgery follow-up visits in March, April, May, and June 2017, Dr. Beiro noted that Plaintiff had been going to physical therapy with good results, and there was improvement in pain, range of motion, and ambulation. (A.R. 1299, 1300, 1301, 1302, 1303.) Inspection of her right knee revealed mild swelling and range of motion to 130° with minimal pain at terminal flexion. (A.R. 1300, 1301, 1302, 1303, 1304.) Four months post-operation, at a follow-up visit in July 2017, Plaintiff reported pain in the left knee that worsened with activity, despite additional cortisone injections. She was told to get a splint and was doing exercises at home. (A.R. 1304.) The left knee had mild swelling,

mild crepitus, tenderness, and range of motion to 130° with pain at terminal flexion. There was no instability of the knee to varus/valgus stress, and motor and sensory were intact. (A.R. 1305.) In November 2017, Dr. Beiro administered a Synvisc injection to Plaintiff's left knee. (A.R. 1635.)

Plaintiff continued treatment with Dr. Beiro throughout 2018 and into 2019. (A.R. 1612-49.) During follow-up visits in June and September 2018, Plaintiff reported that her right knee had improved, with only mild stiffness occasionally, but that her left knee only had minimal improvement in pain. (A.R. 1622, 1640.) During each visit, Dr. Beiro also administered a cortisone injection in her left knee. (A.R. 1624, 1642.) In a subsequent visit in December 2018, Plaintiff reported that her knee symptoms had worsened and that the cortisone injection given last visit provided minimal relief. (A.R. 1612.) Because Plaintiff's pain persisted, Dr. Beiro recommended total knee arthroplasty surgery. (A.R. 1614.)

### 7.  Dr. Terrence Winn, M.D. (2016-2017) (knee, back, neck)

In 2016 and 2017, Plaintiff received pain management therapy for her back from Dr. Terrence Winn, M.D., a pain management physician. Specifically, she underwent physical therapy, injections, and pain medication. (A.R. 1192-1225, 1249-90.)

Over several follow-up visits in 2016, Plaintiff reported to Dr. Winn varying levels of pain, for example, 6/10 level of pain (July, August, and November 2016), 7/10 level of pain (March and April 2016), and 8/10 level of pain (December 2016). (A.R. 1220-21.) Dr. Winn also noted that Plaintiff was taking OxyContin every eight hours and Oxycodone three times a day which allowed her to "carry on her activities of daily living without significant side effects." (A.R. 1220.)

After a sacroiliac (SI) joint injection in November 2016, Plaintiff developed severe pain in her lower back, along with fever, chills, and imbalance. (*Id.*) She was found to have osteomyelitis of the lumbar spine and was hospitalized and received IV antibiotics. (*Id.*) She continued to require

9

antibiotics for another month. (*Id.*) Due to a decrease in medications in November 2016, in a follow-up visit in December 2016, Plaintiff reported increased neck and back pain at an 8/10 level. (A.R. 1256.) She reported that the pain affected her daily activities such as walking, standing, and climbing stairs. (*Id.*)

On January 24, 2017, Plaintiff underwent medial branch block procedure performed by Dr. Winn. (*Id.*) At a follow-up appointment on February 10, 2017, she reported that the procedure had helped her neck pain significantly (*Id.*) On March 7, 2017 during another follow-up visit with Dr. Winn, Plaintiff said her pain had been tolerable with her present medication. (A.R. 1262.) After Plaintiff's knee replacement surgery with Dr. Beiro in March 2017, Plaintiff returned to visit Dr. Winn in April 2017, and reported that she started physical therapy and was doing well. She said that she was ambulating with a cane and that her medication was helping. (A.R. 1268.) She said that the pain in her lower back and neck was about 4/10 with medication and she denied any medication side effects. (*Id.*) She described her left knee and lower back pain as tolerable. (*Id.*)

In May 2017, Plaintiff reported to Dr. Winn that she was doing well and continued to undergo physical therapy. She also said that she had left knee pain and persisting lower back pain that was tolerable. (A.R. 1274-75.) She said she continued to take her medications as prescribed. (A.R. 1275.) In June 2017, Plaintiff reported to Dr. Winn that she was still undergoing physical therapy for the right knee, had left knee injections, and complained of a clicking sound in the right knee. (A.R. 1281.) She said she had increased muscle spasms and tightness in her back but that her overall pain was somewhat controlled by her medication. (A.R. 1281.)

### B.    Medical Opinion Evidence

#### i.    State Agency Medical Opinions

On July 7, 2015, Dr. Arthur Pirone, M.D., a state agency consultant, conducted a physical residual functional capacity assessment on Plaintiff. (A.R. 63-68.) He noted that Plaintiff's anxiety disorder was not severe and that the evidence "indicates that [Plaintiff] is able to stand, walk, sit and use her upper extremities effectively." (A.R. 65-66.) He further opined that Plaintiff could do light exertional work with no manipulative, visual, communicative, or environmental restrictions. (A.R. 67-68.) However, Dr. Pirone found that Plaintiff had exertional and postural limitations, including the following: limited to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, four hours of standing and/or walking, about six hours of sitting with normal breaks, and unlimited push and/or pull. (A.R. 67.) Further, Dr. Pirone found that Plaintiff was subject to postural limitations such as crawling, crouching, kneeling, stooping, balancing, and climbing stairs, ramps, ladders, ropes, and scaffolds. (A.R. 67-68.) Thereafter, on December 2, 2015, Dr. Mary McLarnon, M.D., a state agency consultant, affirmed Dr. Pirone's prior decision. (A.R. 82.)

#### ii.    Dr. David Rubinfeld, M.D.

On June 24, 2013, Plaintiff was examined for an independent medical evaluation by Dr. David Rubinfeld, M.D., on behalf of the workers' compensation board. (A.R. 1363.) During the evaluation, Dr. Rubinfeld observed that Plaintiff was unable to walk on her heels and toes, limped to her right side, and was able to get on and off the examining table unassisted. (A.R. 1364.) Testing showed reduced range of motion, pain, and tenderness in both knees. (A.R. 1365.) Neurologically, the claimant tested normally except for decreased sensation in both lower extremities. (A.R. 1366.) Dr. Rubinfeld diagnosed Plaintiff with cervical spine sprain, lumbar

spine sprain, sprain of the left-shoulder with possible internal derangement, and possible internal derangement of the left knee. He concluded that Plaintiff had a moderate disability and that Plaintiff can return to occupational duties with the following restrictions: "no lifting greater than 35 pounds or carrying greater than 25 pounds, no standing greater than two hours or walking greater than one hour for an indeterminate duration." (A.R. 1367.)

### iii.    Dr. Su Khanthan, M.D.

On November 5, 2013, Dr. Su Khanthan, M.D., conducted an independent medical examination of Plaintiff on behalf of the workers' compensation board. (A.R. 1357.) During the examination, Dr. Khanthan observed that Plaintiff ambulated with a cane and wore a lumbar brace (A.R. 1358.) Her cervical spine had no deformity, but there was vague tenderness on palpation at C4-C6 and the bilateral paravertebral areas. (*Id.*) Further, he opined that Plaintiff had tenderness of her cervical spine, lumbosacral spine and restricted range of motion in her left knee. (A.R. 1359.) He also observed that her right knee movements were full and painless. (A.R. 1358.) Dr. Khanthan diagnosed the claimant with cervical and lumbosacral sprain that was near complete resolution, left knee sprain, and right knee sprain with partial resolution. (A.R. 1359.) He also noted that Plaintiff's daily living activities were not affected. (*Id.*) He concluded the claimant could not return to work for another eight weeks, but added that when the claimant returned to work, she could do so with some restrictions. (A.R. 1360.)

### iv.    Dr. Kevin Yao, M.D.

In January and December 2014, May and September 2015, and March and June 2016, Kevin Yao, M.D., a neurosurgeon, conducted independent medical evaluations of Plaintiff. (A.R. 1323-1354.) In January 2014, Dr. Yao observed the claimant had a limited range of motion of the

neck and tenderness to palpation (A.R. 1354.) Plaintiff reported 10/10 constant neck pain and occasional radiation into both shoulders. (*Id.*)

At the December 2014, May 2015, September 2015, March 2016, and June 2016 exams, Plaintiff reported severe neck and low back pain, radiation into her arms, hands and legs from her neck pain, and ongoing numbness of the fingers. (A.R. 1327, 1330, 1338, 1341, 1349.) And during each of these examinations, Dr. Yao observed that Plaintiff had an antalgic gait, 5/5 strength in the arms and legs, intact sensation, and used a cane to ambulate due to the degree of pain in her neck and back. (A.R. 1327, 1330-31, 1338-39, 1341-42, 1349.) He opined the Plaintiff should not lift more than ten pounds and should not engage in activities where she would have to twist her neck or lower back. (A.R. 1327, 1331, 1334, 1342, 1345.)

### v.    Dr. Eduardo Alvarez, M.D.

On November 16, 2016 and July 17, 2017, Dr. Eduardo Alvarez, M.D., an orthopedic surgeon, performed independent medical evaluations of Plaintiff. (A.R. 1307-20.)

At the November 2016 exam, Dr. Alvarez observed Plaintiff walked with a cane, wore knee braces, and was able to dress and undress herself with no difficulty. (A.R. 1320, 1321.) Dr. Alvarez opined that Plaintiff's cervical and lumbar spine, bilateral knees, and both shoulders had a reduced range of motion. (*Id.*) During the examination, Plaintiff reported "pain, numbness and tingling sensations radiating down both arms and both legs" and "severe pain in both knees." (A.R. 1318.) The foraminal compression test elicited neck and back pain, (A.R. 1320), and the McMurray and Apley's tests were mildly elicited because of pain. (A.R. 1321.) Further, Dr. Alvarez noted that Plaintiff's medications she takes impact her functional ability. (*Id.*)

Thereafter, on July 17, 2017, Dr. Alvarez re-examined Plaintiff and observed that Plaintiff had difficulties sitting comfortably and had normal posture. (A.R. 1310.) Further, he observed a

reduced range of motion of the knees and of the cervical and lumbar spine. (A.R. 1310, 1311.) A foraminal compression test and rotation of the shoulders and pelvis in the erect position elicited complaints of pain. (A.R. 1310.) Dr. Alvarez also noted that the "examination presented subjective complaints of pain with no clinical objective correlation." (*Id.*) Furthermore, a neurological exam showed no motor sensory, or reflex changes in both the upper and lower extremities. (*Id.*) Both shoulders, elbows, hands, and wrists had a normal range of motion with negative impingement signs in the shoulders. (A.R. 1311.)

After both exams, Dr. Alvarez diagnosed Plaintiff with lumbosacral spine sprain/strain with degenerative disc disease and grade 1 spondylolisthesis at L3-L4, status post ACDF surgery at C4-C6 with improvement, status post bilateral knee surgery. (A.R. 1311, 1321.) In conclusion, he opined that Plaintiff had a "total temporary orthopedic disability at 100%." (A.R. 1312, 1320.)

### C.    Review of Testimonial Evidence

#### i.    Plaintiff's Testimony at October 11, 2017 Hearing

At her hearing on October 11, 2017, before ALJ Peter R. Lee, Plaintiff testified to severe neck, back, and knee pain that was caused by an accident in May 2013 when she tripped and fell at work. (A.R. 35-36.) Plaintiff testified that she has undergone various forms of pain management since then.

Plaintiff testified to undergoing several surgeries in connection with the pain in her knees. For her left knee, Plaintiff testified that she had surgery in 2013 and since then, Dr. Berios was treating her with cortisone shots. (A.R. 37-39.) Plaintiff testified that the cortisone shots helped a little but that her left knee still hurt. (A.R. 39.) For her right knee, Plaintiff testified that she had surgery in 2014 and 2016, (A.R. 36-38), and a right total knee replacement surgery in March 2017, six months before the hearing, (A.R. 39.) After the total knee replacement surgery for her right

knee, Plaintiff testified that the pain in her right knee was less severe than before surgery and hoped that it would get better. (A.R. 38.)

Plaintiff also testified to pain in her neck and back. (A.R. 39, 42.) She reported having cervical fusion surgery in 2014 and after the surgery, she still experienced neck pain and that the surgery caused paralysis of her right diaphragm. (A.R. 40.) Plaintiff testified that the neck pain caused numbness in her fingers and arms, (A.R. 40), and that she cannot lie on her left side as a result. (A.R. 41.) Since the surgery. Plaintiff testified that she receives trigger point injections to her neck. (A.R. 41.) For her back injuries, Plaintiff testified that she received pain management therapy, (A.R. 42), and that she is planning to undergo back surgery in the future. (A.R. 43.)

As to her capabilities, Plaintiff testified that she could only sit for five to ten minutes comfortably, stand for five to ten minutes, and walk for less than half a block. (A.R. 45-46.) Plaintiff estimated that she could lift seven pounds. (A.R. 46.) Plaintiff testified that she tries to do simple exercises, such as walking and stretching, (A.R. 44), and that she purchased ambulatory aids, including a cane and walker, on her own, without a prescription. (A.R. 47-48.) Plaintiff testified her husband or grandchildren help her perform household chores and go grocery shopping. (A.R. 50.) Plaintiff testified that she could not use a computer for more than a few minutes due to numbness in her hands and arms. (A.R. 51.) Plaintiff testified that she could drive but tries not to if she does not have to. (A.R. 52.) Plaintiff also testified that she currently takes pain medication—Oxcyontin and Oxycodone—which she said subsides her pain for a while, but does not affect her alertness. (A.R. 50-51.) Further, Plaintiff testified that she does not have any mental health issues. (A.R. 52-53.)

###### ii.    Plaintiff's Testimony at January 29, 2020 Hearing

At her hearing on January 29, 2020, before AL Peter R. Lee, Plaintiff testified that her condition since the last hearing had slightly worsened. (A.R. 1432.) Since the last hearing, Plaintiff testified she had undergone knee replacement surgery on her left knee. She again testified to knee pain, resulting from various surgeries to both knees. (A.R. 1431-32.)

As to her capabilities, Plaintiff testified that she could not use a computer due to numbness and pain in her hands and arms. (A.R. 1436.) Plaintiff testified she could not sit for longer than six hours due to knee pain and back pain. (A.R. 1436.) Plaintiff also testified that she still takes medications daily to help with pain, but the pain has gotten worse since the last hearing and further, that the medications affect her ability to focus and increase fatigue. (A.R. 1433-34, 1436.)

#### D.    The ALJ's Findings

On November 18, 2020, the ALJ issued a written decision analyzing whether Plaintiff satisfied her burden of demonstrating disability using the standard five-step process. The ALJ determined that Plaintiff's "medically determined impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (A.R. 1386.)

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 9, 2013. (A.R. 1375.) At step two, the ALJ found that Plaintiff suffered from the following severe impairments: degenerative disc disease with radiculopathy, status post bilateral knee replacement, and bursitis of the left shoulder. (A.R. 1375.) The ALJ also found that Plaintiff's mental impairments of anxiety were non-severe. (A.R. 1376.) However, at step three, the ALJ

found that none of these impairments, or any combination of these impairments, met or equaled

the severity of any listed impairments in the Regulations. (A.R. 1377.)

At step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to

perform less than the full range of sedentary work as defined by the relevant Regulation, with

modifications. (*Id.*) Sedentary work is defined in the Regulations as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally
> lifting or carrying articles like docket files, ledgers, and small tools. Although a
> sedentary job is defined as one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job duties. Jobs are sedentary if
> walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). The ALJ noted the following modifications:

> [T]he claimant can lift and/or carry up to 10 pounds maximum, push and/or pull up
> to 10 pounds frequently, sit for up to six hours in an eight-hour workday, and stand
> and/or walk for up to two hours in an eight-hour workday. She can occasionally
> balance, stoop, crouch, and climb stairs and ramps, but can ever crawl or climb
> ladders, ropes, and scaffolds. The claimant can occasionally reach overhead and
> frequently reach in all other directions with the left arm. Additionally, the claimant
> can frequently finger and handle, but can never be exposed to unprotected heights
> or hazardous machinery. The claimant requires the option to stand or change
> positions and must be able to use a hand-held assistive walking device.

(A.R. 1378.) This RFC is sufficient to meet the requirements of Plaintiff's past relevant work as a

customer service representative, which requires performance of work-related activities at a

sedentary physical exertion level. (A.R. 1388-89.) The ALJ's RFC determination was based on

consideration of "all [Plaintiff's] symptoms and the extent to which these symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence."

(A.R. 1378.) The ALJ determined that "the [plaintiff's] medically determinable impairments could

reasonably be expected to cause some of the alleged symptoms; however, the claimant's

statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence in the record" and, thus, "to the

extent that [Plaintiff] is limited to sedentary work", "the medical evidence does not support a finding of disability." (A.R. 1386.)

The ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from May 9, 2013, through Plaintiff's date last insured on December 31, 2018. (A.R. 1389.)

## II.    <u>STANDARD OF REVIEW</u>

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotations and citations omitted). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite

conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…" *Id*. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id*. § 1382c(a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id*. § 404.1520(a)(4)(i); *see Bowen v. Yuckert*, 482 U.S. 137, 146–47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See id*. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. *Id*. § 404.1520(c); *see Bowen*, 482 U.S. at 146–47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." *Id*. § 404.1522(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying

or handling." *Id*. § 404.1522(b)(1). A claimant who does not have a severe impairment is not considered disabled. *Id*. at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). *Id*. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id*. § 404.1520(d); *see also Bowen*, 482 U.S. at 146–47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See id*. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id*. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186. If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141.

If the claimant can perform past relevant work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141–42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at

146–47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant can perform work and not disabled. *Id*.

III.   **PLAINTIFF'S CLAIM ON APPEAL**

Plaintiff raises two issues on appeal. First, Plaintiff argues that the ALJ's step three conclusion did not sufficiently explain why Plaintiff's impairments did not meet the requirements of the any listed impairments in the Regulations 20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 1.04, 12.04 and 12.06. (*See* Plaintiff's Moving Brief ("Pl. Br.") at 10-18.) Second, Plaintiff argues that the ALJ's RFC is not supported by substantial evidence, because the ALJ failed to consider Plaintiff's subjective allegations of pain and the medical opinions of all Plaintiff's treating physicians. (Pl. Br. at 19-43.) The Court addresses each argument in turn.

A.   **The ALJ's Step Three Analysis is Harmless.**

Plaintiff challenges the ALJ's finding at step three that Plaintiff's combination of impairments did not meet or medically equal the criteria of any listed impairment under Listings 1.02 and 1.04. As noted above, at step two, the ALJ found that Plaintiff suffered from the following severe impairments: degenerative disc disease with radiculopathy, status post bilateral knee replacement, and bursitis of the left shoulder. (A.R. 1375.) The ALJ also found that Plaintiff's medically determinable mental impairment of anxiety caused mild limitation and was non-severe. (A.R. 1403.)

At step three, an ALJ is charged with determining whether a claimant's impairment or combination of impairments meets, or equals, the criteria of an impairment listed in the Impairment List. *Diaz v. Comm'r of Social Sec.*, 577 F.3d 500, 502 (3d Cir. 2009). If the impairment, or

combination of impairments, meets or equals the criteria of the Impairment List, the claimant qualifies as disabled. *Id.* At this point, the ALJ must set forth the reasons for his findings. *Ibanibo v. Comm'r of Social Sec.*, No. 11-3822, 2012 WL 2945748, at *4 (D.N.J. July 18, 2012) (citing *Burnett*, 220 F.3d at 119). "Although neither magic language nor particular analysis is required, an ALJ's conclusory statement is insufficient when it does not identify any particular listings or discuss whether the impairments met or medically equaled a listing. Further, the ALJ must provide more than a "conclusory statement … beyond meaningful judicial review" and the analysis must be more than merely perfunctory. *Burnett*, 220 F.3d at 119.

> In this case, the ALJ's step-three determination stated:

> The record fails to establish that the claimant has an impairment or combination of impairments that meets or medically equals the criteria of any listed impairment. The medical evidence of record does not document signs, symptoms, and/or laboratory findings indicating any impairment or combination of impairments severe enough to meet the criteria of any listed impairment. No treating, examining, or non-examining medical source has mentioned findings or rendered an opinion that the claimant's impairments, singly or in combination, medically equaled the criteria of any listed impairment. Specific consideration has been given to the applicable sections of 1.02 and 1.04 Musculoskeletal System of the listed impairments.

(A.R. 1377-78.)

> In this case, the ALJ's discussion at step three does not describe the reasons for his decision at step three and, standing alone, the ALJ's step three decision does not really permit "meaningful judicial review" of the issue of whether Plaintiff's combined impairments medically equal any of the Listings. *See, e.g.*, *Woods v. Comm'r of Soc. Sec.*, No. 16-01657, 2017 WL 2815075, at *12 (D.N.J. June 29, 2017); *Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x 260, 263 (3d Cir. 2006). For instance, the ALJ's step-three analysis stated that the medical evidence of record, including treating, examining, and non-examining medical sources, "does not document signs, symptoms, and/or laboratory findings indicating any impairment or combination of impairments severe

enough to meet the criteria of any listed impairment." (A.R. 1403.) Further, the ALJ noted that "[s]pecific consideration has been given to the applicable sections of 1.02 and 1.04 *Musculoskeletal System* of the listed impairments." (A.R. 1403.) While the ALJ does not discuss Listings 1.02 and 1.04 specifically, the Third Circuit has "recently made clear that ALJs need not cite specific Listings at step three as long as the ALJ's review of the record permits meaningful review of the step-three conclusions." *Lopez v. Comm'r of Soc. Sec.*, 270 F. App'x, 119, 121 (3d Cir. 2008).

Indeed, analysis at other steps can support an ALJ's step three conclusion because courts read decisions as a whole, and the ALJ is not required to adhere to a particular format. *See Jones*, 364 F.3d at 505; *Luna v. Comm'r of Soc. Sec.*, No. 14-6953, 2016 WL 3763339, at *5 (D.N.J. July 13, 2016); *see also Karstein*, 2018 WL 5669172, at *7 n.2 (citing *Allen v. Comm'r of Soc. Sec.*, No. 10-2614, 2011 WL 1321985, at *9 (D.N.J. Mar. 30, 2011)). In *Jones*, the Third Circuit considered whether the following step-three determination was sufficient: "[A]fter carefully compar[ing] the claimant's signs, symptoms, and laboratory findings with the criteria specified in all of the Listings of Impairments, the claimant's impairments do not meet or equal the criteria established for an impairment shown in the Listings." 364 F.3d at 503 (internal quotation marks omitted). Although the ALJ's step-three analysis in *Jones* did not mention any of the Listings, the Third Circuit held that the step three determination satisfied *Burnett*. It held:

> Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review. In this case, the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that Jones did not meet the requirements for any listing, including Listing 3.02(A). The ALJ's opinion discusses the evidence pertaining to chronic obstructive and restrictive lung disease, specifically referencing "[p]ulmonary function studies ... consistent with moderately severe obstructive and restrictive defects," but pointing to the lack of

pulmonary complications, and a finding that claimant's lungs were clear. Also, the ALJ noted that claimant's medical history showed no frequent hospitalization or emergency treatments. This discussion satisfies Burnett's requirement that there be sufficient explanation to provide meaningful review of the step three determination.

*Id.* at 504-05 (citations, citation to record, and footnote omitted).

Here, as in *Jones*, the ALJ discussed all of the relevant medical evidence at step four before determining Plaintiff's RFC, and, concluding that Plaintiff was not disabled. This makes this case distinguishable from *Burnett* because the ALJ there failed to analyze sufficiently the evidence, including objective medical reports and Plaintiff's testimony. *See Burnett*, 220 F.3d at 119-20.

In other parts of his analysis, the ALJ discussed the evidence relating to, *inter alia*: (1) Dr. Tehrany's (orthopedic surgeon) diagnosis and treatment of bilateral knee injuries and pain; bilateral knee surgical procedures; opinion on limitations on work-related activities, including sitting for less than six hours a day; (2) Dr Shiau's (neurosurgeon) diagnosis and treatment of cervical spondylosis and traumatic induced neck pain; cervical spine surgery and resulting right-sided diaphragmatic paralysis as a complication of that surgery; results of various neurological examinations, with respect to cervical and lumbar pain, including recommendation that Plaintiff was unable to work; (3) Dr. Bakshi's (pain management) diagnosis and treatment of cervical disc herniation and cervical and lumbar radiolopathy; (4) Dr. Rao's (neurologist) neurological examination of Plaintiff, including diagnosis of pain in the limb, cervical radiculitis, lumbar radiculopathy; (5) Dr. Lipson's (neurosurgeon) physical examination and treatment Plaintiff's cervical spine pain; recommendation for cervical spine surgery and Plaintiff's decision to continue conservative management for her pain; (6) Dr. Beiro's (orthopedic surgeon) physical examination of Plaintiff's bilateral knees showing mild swelling and tenderness, mild pain, and reduced range of motion; right knee surgeries to address ongoing pain; observations that pain, range of motion, and ambulation were steadily improving after surgeries; (7) Dr. Winn's (pain management

physician) diagnosis and physical examination of cervical disc displacement, cervical and lumbar facet syndrome, cervical radiculitis, and lumbar disc displacement and radiculitis; and (8) results from Plaintiff's consultative physical examinations by state agency consultants and independent physicians on behalf of the workers' compensation board. (A.R. 1378-86.) The ALJ also specifically identified Plaintiff's testimony and other allegations she reported during various medical examinations, with respect to pain that he took into consideration in his analysis. (*See, e.g.*, A.R. 1379, 1404, 1412.)

As discussed further below, the ALJ's discussion at step four of the listings is sufficient for meaningful judicial review. *See Burnett*, 220 F.3d at 119. As such, the ALJ's failure to discuss specific Listings or medical evidence at step three is not material and is harmless, because the ALJ discusses his opinion at step four, and, when read as a whole, it is evident that the ALJ considered relevant medical evidence in the context of Plaintiff's limitations. *See Rivera*, 164 F. App'x at 263 (holding that the ALJ's conclusory statement in step three was harmless because there was "abundant evidence supporting the position taken by the ALJ, and comparatively little contradictory evidence"); *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) ("We conclude that a remand is not required here because it would not affect the outcome of the case.")

**B.    The ALJ's RFC determination is based on substantial evidence.**

Next, Plaintiff contends that the ALJ's step-four determination of Plaintiff's RFC was not based on substantial evidence because he rejected (1) Plaintiff's "well-documented" testimony and evidence of subjective pain and (2) "every treating physician's RFC opinion." (Pl. Br. at 19.)

A plaintiff's RFC is the most that a plaintiff can do despite her limitations. 20 C.F.R. § 416.945(a); *Burnett*, 220 F.3d at 121 (citing *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)). When reaching an RFC determination, an ALJ is required to consider all of the evidence.

*Burnett*, 220 F.3d at 121. This includes medical records, medical opinions, and the individual's subjective allegations. 20 C.F.R. § 404.1546(c). However, the Third Circuit's holding in *Burnett* "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Jones*, 364 F.3d at 505. Further, "the ALJ is required only to include limitations which he finds credible." *Lopez*, 270 F. App'x at 122-23 (citations omitted). Thus, to the extent that the ALJ found Plaintiff's other alleged limitations less than credible, they were properly excluded from the RFC. *See Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002). Plaintiff bears the burden of demonstrating that she lacks sufficient RFC to perform her past relevant work. *See Lopez*, 270 F. App'x at 123 (citing 20 C.F.R. § 416.920I.) Moreover, "[w]here the ALJ's findings of fact are supported by substantial evidence, [district courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012) (internal quotation marks and citation omitted).

In this case, the Court finds that substantial evidence supported the ALJ's finding that Plaintiff could perform "less than the full range of sedentary work." (A.R. 1414.) The above evidence cited in the Court's discussion of the ALJ's step-three determination supports the conclusion that, although Plaintiff remains in pain from injuries she sustained in the May 2013 accident and subsequent surgeries relating to those injuries, the treatment she has received has rendered her capable of performing some sedentary work. (A.R. 1386.)

### i.   Plaintiff's Allegations of Pain

First, Plaintiff alleges that the ALJ failed to seriously consider her subjective complaints of pain and evidence supporting those complaints in concluding that she was capable of performing her past work. (Pl. Br. at 32-38.) The Court disagrees.

A plaintiff's subjective complaints of pain must be seriously considered in disability evaluations, even when not supported by medical evidence, but are not controlling. *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985)). However, pain alone will not establish disability. *Schmidt v. Comm'r of Soc. Sec.*, 465 F. App'x 193, 197-98 (3d Cir. 2012). "While there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself." *Green v. Schweiker*, 749 F.2d 1066, 1067 (3d Cir. 1984). Where medical evidence does support a plaintiff's complaints of pain, the complaints should then be given "greater weight" and may not be disregarded unless there exists contrary medical evidence. *Mason*, 994 F.2d at 1067-68 (citations omitted).

Here, the ALJ acknowledges in his RFC discussion that the medical evidence strongly supports Plaintiff's subjective complaints of pain. (*See, e.g.*, A.R. 1386 ("[Plaintiff] did undergo surgery for the alleged impairment, which certainly suggests that the symptoms were genuine.")); A.R. 1388 ("I acknowledge [Plaintiff] does have reduced physical capabilities due to her neck, back, and bilateral knee issues.") Further, the ALJ considered and properly credited Plaintiff's "complaints of bodily pain that interfered with her daily and work activities." (A.R. 1386.) For instance, the ALJ recounted Plaintiff's testimony regarding her "constant pain all day long", her use of a cane, and her inability to walk a few feet before needing to stop and rest. (A.R. 1378.)

27

Nevertheless, the ALJ explained that he did not find Plaintiff's symptoms, including her pain, to be disabling because her treatment records showed improvement in Plaintiff's pain and her overall physical condition. (A.R. 1386.) The ALJ sets out in detail the various surgeries Plaintiff underwent "to address her ongoing complaints of bodily pain" and the "treatment records show improvement in [Plaintiff's] physical condition." (A.R. 1388.) In reaching this determination, the ALJ considered the medical evidence demonstrating Plaintiff's long history of treatment and surgeries for her left shoulder, bilateral knees, and cervical and lumbar spine during the relevant period. (*Id.*) He noted that after each surgery, Plaintiff "demonstrated improvement compared to her preoperative status." (*Id.*) For instance, records from Dr. Beiro in 2018 evinced good results with physical therapy and improvement of pain, range of motion, and ambulation. (*Id.*) Such improvement in physical condition and pain are also supported by treatment records from Dr. Winn. During medical appointments with Dr. Winn, Plaintiff reported to him varying levels of pain, from 4/10 to 8/10. (A.R. 1220-21.) Dr. Winn also opined that Plaintiff's medication that she took for pain allowed her to "carry on her activities of daily living without significant side effects", (A.R. 1220). And in various appointments in 2017, Dr. Winn stated that Plaintiff reported that (1) a medial branch block surgery helped her neck pain significantly, (A.R. 1256), (2) her pain had been tolerable with present medication, (A.R. 1262), (3) her back and neck pain was a level 4/10 with medication, (A.R. 1268), (4) her left knee and lower back pain was tolerable, (A.R. 1268, 1274-75), and (5) her overall pain was somewhat controlled by her medication. (A.R. 1281.)

Therefore, the Court finds that the ALJ's RFC determination explicitly incorporated Plaintiff's complaints of pain and considered them in the context of corroborative medical evidence. *See, e.g.*, *Jorge v. Kijakazi*, 2022 WL 4536267, at *8-10 (concluding that the ALJ properly evaluated plaintiff's complaints of pain in finding plaintiff not disabled due to medical

evidence showing improvement after surgeries and treatments.). Accordingly, there is substantial evidence to support the ALJ's conclusion that Plaintiff's pain was not disabling.

### ii.   Treating Physicians' Opinions

Next, Plaintiff's argument that the ALJ's RFC is not based on the opinions of Plaintiff's treating physicians is unpersuasive. (Pl. Br. at 41-42.)

*Morales v. Apfel* requires that "the ALJ accord treating physicians' reports great weight," but there is no requirement to accept those opinions if they are not supported by sufficient evidence in the record. 225 F.3d 310, 317 (3d Cir. 2000). *See* 20 C.F.R. § 404.1527(d)(2) (explaining that the Commissioner looks to medical opinions to provide evidence, but "the final responsibility for deciding [whether an impairment meets or equals an impairment in the Listing] is reserved to the Commissioner"); *Id.* § 404.1527(b) ("In determining whether [a plaintiff is] disabled, [the Commissioner] will always consider the medical opinions in [the] case record together with the rest of the relevant evidence."). And when a conflict in the evidence exists, the ALJ may choose whom to credit, but "cannot reject evidence for no reason or for the wrong reason." *Mason,* 994 F.2d at 1066 (quoting *Cotter v. Harris,* 642 F.2d 700, 707 (3d Cir. 1981)).

Here, the ALJ did not "reject", *i.e.*, fail to consider at all, the opinions of various treating physicians, as Plaintiff suggests. Instead, he considered such evidence and properly afforded it the weight it was due. *See Rivera*, 164 F. App'x at 263. Where the ALJ discounts, rather than rejects, medical opinion evidence, the ALJ must "consider all the evidence and give some reason for discounting the evidence." *Plummer*, 186 F.3d at 429. *See generally* 20 C.F.R. § 414.1520c(a)–(c). It is the ALJ's responsibility to determine credibility and the relative weight to be given to the evidence. *See Plummer*, 186 F.3d at 429; *Mason***,** 994 F.2d at 1066.

In the ALJ's RFC determination, he provides adequate explanation for discounting portions of or statements from conflicting medical opinions. (A.R. 1387-88.) For instance, Plaintiff objects to the ALJ's rejection of Dr. Tehrany's opinion, (Pl. Br. at 43), however, the ALJ explained that he gave Dr. Tehrany's opinions some weight. (A.R. 1387.) While the ALJ explained that he gave more weight to Dr. Tehrany's opinion in establishing Plaintiff's limitations to sedentary work, but less weight for his opinions provided in two questionnaires because the forms were boilerplate and did not contain detailed explanation or more context to his opinions. *See Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."); *but see Plummer*, 186 F.3d at 429 (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985) (stating that a treating physician's medical opinion is entitled to greater weight when he provides supporting explanations).

Plaintiff also argues that the ALJ's RFC determination with respect to Plaintiff's ability to do sedentary work involving up to six hours sitting and two hours walking was not supported by substantial evidence and discounted Plaintiff's own testimony. Specifically, Plaintiff testified that she could only sit for five to ten minutes comfortably, stand for five to ten minutes, and walk for less than half a block. (A.R. 45-46.) An examination of the record, however, suggests there is substantial evidence to support the ALJ's conclusions regarding Plaintiff's ability to stand or sit. For instance, Dr. Pirone and Dr. McLarnon, the state agency consultant physicians, found that Plaintiff could sit for about six hours, with breaks. (A.R. 67, 82.)

The ALJ also considered contradictory evidence and provided explanations as to why he weighed certain contradictory evidence less. Dr. Tehrany, one of Plaintiff's treating physicians, opined that she could sit for less than six hours a day. (A.R. 991, 998.) However, as explained above, this opinion was discounted by the ALJ because it was presented in a boilerplate check-box

report. (A.R. 1387.) Further, Dr. Tehrany did not specify as to how much time Plaintiff could feasibly sit for a day. Dr. Shiau opined that Plaintiff was "unable to stand or sit for prolonged periods of time due to her conditions. (A.R. 732, 1015.) However, the ALJ reasoned that he gave less weight to Dr. Shiau's opinion because it lacked specificity as to, for instance, the amount of time Plaintiff could reasonably stand or sit. (A.R. 1413.) Dr. Alvarez re-examined Plaintiff and observed that Plaintiff had difficulties sitting comfortably and had normal posture. (A.R. 1310.) This opinion was afforded little weight by the ALJ because Dr. Alvarez did not explicitly explain Plaintiff's limitations as they relate to workplace capabilities. (A.R. 1388.)

In sum this Court finds that, in evaluating Plaintiff's RFC at step four, the ALJ considered both objective medical evidence and Plaintiff's subjective complaints. Because a sufficient basis in the record exists to support the ALJ's conclusion that a light exertion RFC is appropriate, the ALJ's finding cannot be disturbed.

## IV.   **CONCLUSION**

For the reasons set forth above, the ALJ's decision is **AFFIRMED**. An appropriate order shall follow.

Date: **March 31, 2023**

/s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**